UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAREE KRAUSE,

      Plaintiff,

                                      Case No. 1:23-cv-46

v.

                                      Hon. Hala Y. Jarbou

COUNTY OF VAN BUREN,

      Defendant.

_____/

## OPINION

Karee Krause brings this sex discrimination action against her former employer, the County of Van Buren ("Van Buren" or "the County"). She alleges the County paid her less than two male employees for performing substantially similar work in violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 203 et seq., as well as Michigan's Workforce Opportunity Wage Act ("WOWA"), Mich. Comp. Laws § 408.931 et seq., and the Elliot-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2102 et seq. Before the Court is the County's motion for summary judgment (ECF No. 29). For the reasons herein, the Court will grant the motion as to Krause's WOWA claim and deny it as to her EPA and ELCRA claims.

### I. JURISDICTION

The Court has federal question subject matter jurisdiction over this matter under 28 U.S.C. § 1331. Additionally, Krause's state claims are so related to her federal claims as to warrant supplemental jurisdiction under 28 U.S.C. § 1367.

## II.  FACTS

Krause's claims arise from her employment with the County as a Veteran Service Coordinator ("VSC") in the Veterans' Affairs Services Office ("the Office").  She worked for the County from April 23, 2018 until her resignation on April 15, 2021.  (Krause Emp. Confirmation, ECF No. 30-2; Resignation Letter, ECF No. 32-21.)  Her annual salary began at $32,370, which reflected a 37.5-hour work week at a $16.60 hourly rate.  (Krause Offer Letter, ECF No. 30-3.) When she left, her annual salary was $39,663—37.5 hours per week at $20.34 an hour.  (Krause Emp. R., ECF No. 32-1.)

### A. Krause's Prior Experience

Krause's pre-County professional experience is significant.  She served for twenty-two years in the Army Guard, retiring with the rank of Staff Sergeant in 2008.  (Krause Dep. 5-6, ECF No. 30-3.[1])  Following her military service, she worked for fourteen years as a case manager at the Department of Health and Human Services ("DHHS") in Cassopolis, Michigan.  (*Id.* at 6.)  She then worked at the Lakeland Center for Wound Care from 2014 to 2015 followed by a nursing home from 2016 to 2018.  (*Id.* at 7-9.)

### B. The Beginning of the Employment Relationship

The County posted the VSC position in January 2018.  (VSC Job Posting, ECF No. 30-1.) The posting described the position as the "coordination and delivery of all Federal, State, and County benefits to Veterans of Van Buren County."  (*Id.*)  The VSC's first listed essential job function would be to "Manage and direct overall Veterans' Affairs Services Office operations."

---

[1] It appears that Krause inadvertently failed to file multiple exhibits with her response, including her own deposition. She has since filed this exhibit late.  However, the County filed an excerpt of her deposition in support of its motion for summary judgment (*see* ECF No. 30-3).  For ease of reference and because her late-filed exhibit is the more-complete version, the Court will refer to Krause's exhibit.

(*Id.*)  The hourly rate was advertised as $16.60 an hour.  (*Id.*)  This position was new to the County, as was the Office itself.  (Krause Dep. 13-14.)

Krause applied and interviewed in March 2018 with several people, including John Faul (the County Administrator) and Dick Overton, a member of the County's Soldiers and Sailors Relief Commission.  (*Id.* at 11.)  The County hired Krause who began working the following April. Although the job posting advertised a part-time position, Krause worked for the County full-time. (*Id.*)

### C. Krause's Job Duties at the County

Many of Krause's job duties are undisputed.  The VSC job posting lists the following responsibilities and duties:

- Manage and direct Veterans' Affairs Service Office operations.
- Counsel veterans/dependents and file disability compensation, pension claims, and appeals for the veterans/dependents of Van Buren County, in addition to other Veterans' Administration programs.
- Manage the Veterans Burial Benefit Fund and Soldier & Sailors Relief Fund in conjunction with the Soldiers Relief Commission and the Probate Court.
- Collaborate with the State Veterans Trust Fund and Trust Agent
- Collaborate and coordinate with appropriate Federal, State, and local Officials along with community partners; speak at various events in order to promote public awareness as to the functions of the Van Buren County Veterans' Affairs Office.
- Promote the recognition of Veterans and their contribution to the community.

(VSC Job Posting.)  Krause's description of her day-to-day job duties tracks those listed in the job posting.  Her core duty was to interface with veterans—she regularly interviewed veterans and their family members, ran compensation claims filed by veterans, and assisted veterans in obtaining certain benefits, community services, and military documentation.  (Krause Interrog. ¶ 3, ECF No. 32-9.)  Given the infancy of both the department and the position, Krause physically set up the office and engaged in outreach efforts to publicize the available services.  (*Id.*; Krause

Dep. 14.)  She acquired various accreditations, engaged in advocacy and publicity for veteran's issues within the County, and attended meetings with local and state-level representatives.  (Krause Interrog. ¶ 3.)

The County does not dispute the foregoing duties.  Rather, it highlights some duties she did *not* perform.  She did not set the Office's budget.  (Krause Dep. 42.)  She did not do any home visits with veterans (*id.* at 38), though apparently she was prevented from doing so "for safety concerns" because "she was a single female[.]"  (Faul Dep. 49-50, ECF No. 39-2.[2])  She did not write grant applications for the department (Krause Dep. 26), though she did assist in implementing those grants (Faul Dep. 94).

Despite the job posting's reference to "directing" the Office, Faul disputes that Krause held a director role.  According to him,

> I wouldn't say she operated the department, because to me that involves approaching the board, informing the board, doing board briefs, filling out grants, doing reports.  Her job was the service [of] Veterans, which is what she did.  So in terms of operating a department, no.  But operating Veterans Services to individuals, yes.

(*Id.* at 36.)

### D. The Office Receives Additional Funding

Sometime in 2020, the County sought and received a voter-approved millage[3] to increase the funding and scope of the Office.  (*Id.* at 55.)  Krause assisted with advocating for the millage but was not involved in drafting ballot language.  (Krause Dep. 44.)  With the millage, "the whole department could be revamped, restructured" and the County could implement "whatever the

---

[2] Similar to her own deposition, it appears that Krause inadvertently failed to file Faul's deposition.  Because the County filed an excerpt of Faul's deposition in support of its motion for summary judgment (*see* ECF No. 30-5), the Court will refer to Krause's late filed exhibit, which appears to be Faul's complete deposition.  Additionally, Krause quoted this language directly in her motion for summary judgment, so there is no prejudicial impact in considering it here.

[3] A millage is a type of tax applied to real property.  *Mill Rate*, *Black's Law Dictionary* (11th ed. 2019).

board wanted to do with it, create a director level position, buy service dogs, whatever." (Faul Dep. 55.)  The millage passed in March 2020, but the associated tax revenues did not begin to accrue to the Office until January 2021.  (*Id.* at 56.)

As Faul was transitioning out of his County Administrator role, he discussed options for using the increased funding with the County's Veterans Services Committee.  (*Id.* at 56-58.)  One of the options discussed was the creation of a director level position for the Office, the Veterans Services Director ("VSD").   Faul suggested creating a director level position "with the understanding that [the VSC] position [that] in fact [Krause] filled would remain in the general fund for two reasons.  One, in case the millage ever failed, [we] would still have budgeted for that position; and two, the MVAA grant required that maintenance of effort to be eligible for that grant." (*Id.* at 55.)

To explore the VSD position option, Faul commissioned a wage study to survey what other counties paid their analogous employees.  (*See generally* Wage Study Correspondence, ECF No. 32-15.)  The wage study revealed an average minimum and maximum annual salary for both the VSD role and the VSC role.  (Wage Study, ECF No. 32-16.)  For the VSD role, the average minimum salary was $57,130 while the average maximum was $73,836.  For the VSC role, the average minimum salary was $38,250[4] while the average maximum was $48,189.  (*Id.*)

On October 13, 2020, Overton—who was involved in Krause's initial hiring—emailed the County's Veterans Services Committee and recommended that they elevate Krause to the VSD position.  (Overton Email, ECF No. 32-19.)  He noted, "She has earned the opportunity[,] the Veterans community is very happy with her[,]" and "[s]he could easily establish [that] she had run

---

[4] The wage study appears to contain a mathematical error.  The minimum salary as computed in the exhibit is $31,875, but this includes a zero value from a county that does not have a VSC or otherwise failed to provide applicable data.  That entry should have been excluded when calculating the average; $38,250 is the correct figure.

the office with little or no assistance on knowledge matters from anyone in the county." (*Id.*)  He remarked that Krause was "thoroughly qualified and trained in areas some officers are not." (*Id.*) He also explicitly characterized her role at the Office as "working under" the VSD job description "for the last two years." (*Id.*)  Overton ended his email on a note of caution should the County not elevate Krause: "The wage disparity for a function identical to what she had been performing would leap out when examined and require justification.  As a female who has performed very well, it would raise questions as to why she was overlooked." (*Id.*)

Faul dismissed Overton's concerns about the legal implications, but ultimately agreed that Krause could be worthy of consideration for the VSD position.  (10/13/2020 Faul Email, ECF No. 32-20.)  He believed the $55,000 salary range that Overton suggested was likely appropriate and noted that if she received the position her increased duties would include "higher level tasks such as administering the MVAA grants, and possibly leading a strategic planning process." (*Id.*)

Ultimately, the County chose not to offer Krause the VSD role and appears to have shelved the position for a time.  (Faul Dep. 113-15.)

### E. The End of the Employment Relationship

At the time the County was considering creating the VSD position, Krause made an annual salary of $39,663, reflecting an hourly wage of $20.34.  (Krause Emp. R.)  The only salary increases she had received during her tenure were annual "step" increases.  (Faul Dep. 44.)  She avers that she made several requests for more substantial raises throughout her employment, hoping to land in the "[$]20 to $30 an hour range[.]" (Krause Dep. 41.)  The County's reaction to her requests was "[a] flat no." (*Id.*)

In 2021, the Veterans Affairs Director position in Cass County became available.  (Krause Dep. 57-58.)  She applied for, received, and accepted the job.  The position was closer to home

6

and she "got tired of the hostility" at the Office.  (*Id.* at 59.)  Krause resigned from the Office on

April 15, 2021.  (Resignation Letter.)

### F. The County Hires Two New Employees

The County viewed Krause's resignation as "an opportunity to rewrite the job description

to get a higher level skill set."  (4/1/2021 Email, ECF No. 32-22.)  They arranged for temporary

cover from neighboring counties.  (*See, e.g.*, VBC-St. Joseph County Service Contract Approval,

ECF No. 32-33.)  Eventually, they hired two permanent Office employees—David Krzycki as

VSD, and Dennis Urquhart as Veterans Services Officer ("VSO").

#### 1. David Krzycki

Krzycki retired from the military after twenty-four years of service and has a master's

degree.  (Krzycki Dep. 5-6, ECF No. 39-3.[5])  While in the service, he served in both combat and

staff roles.  Later in his tenure, he became a department head for a new agency called the Defense

Logistics Agency, which he helped set up.  (*Id.* at 30-32.)  He never worked in social services or

as a veteran's services officer (Peat Dep. 34-35, ECF No. 39-4[6]), but he avers that he would

sometimes counsel fellow soldiers on various benefits options available to them.  (Krzycki Dep.

at 38-39.)

Krzycki applied for the VSD position sometime in the summer of 2021.  (*Id.* at 45-50.)

Among the applicants, the County viewed Krzycki as "right at the top of the list as far as . . . just

being perfect."  (Peat Dep. 34.)  Commissioner Randy Peat viewed Krzycki as "a hero" due to his

military service—notably, despite her similar military service, Peat "never really thought of

[Krause] like that[.]"  (*Id.* at 35.)  The County offered Krzycki a higher salary than initially

---

[5] It appears that Krause inadvertently failed to file Krzycki's deposition.  Because the County filed an excerpt of this deposition in support of its motion for summary judgment (*see* ECF No. 30-15), the Court will refer to Krause's exhibit, which appears to be Krzycki's complete deposition.

[6] Same with respect to Peat's deposition (*see* ECF No. 30-9).

anticipated to "lure him in."  (*Id.*)  Krzycki accepted the position at an annual salary of $69,732.

(Krzycki Offer Letter, ECF No. 32-37.)  He began working at the Office in August 2021.  (*Id.*)

Krzycki met with the County Administrator to discuss the goals of the Office.  (Krzycki

Dep. 57.)  He physically reorganized the Office, engaged in outreach and marketing to veterans

and partner agencies, earned necessary credentials, and implemented new veteran's programs.  (*Id.*

at 56-58, 63-64, 71-75.)  He continues to assess the Office's scope and adjust services as necessary,

he conducts in-home visits with veterans, and he writes grants.  (*Id.* at 63-66.)

He is also responsible for "reassess[ing] and redefin[ing] roles in [the O]ffice."  (*Id.* at

113.)  To that end, the County permitted Krzycki to hire another person.  (*Id.* at 57.)  The Office

posted the VSO position on July 22, 2021 (VSO Posting, ECF No. 30-12) and hired Dennis

Urquhart in September (Urquhart Acceptance, ECF No. 30-17).  Krzycki is responsible for

supervising Urquhart.  (Krzycki Dep. 107-109.)  Krzycki has also hired an additional entry-level

employee who started working at the Office in May or June of 2023.  (*Id.* at 87, 113.)

### 2. Dennis Urquhart

Urquhart spent three years in active duty in the U.S. Navy and four years in active reserve.

(Urquhart Appl., ECF No. 30-18.)  He then worked for more than thirty years in the private sector

in customer service, sales, construction, and social services.  (*Id.*)  His most recent job prior to

starting at the Office was a senior veteran community engagement officer at the Veterans Service

Office for the Vietnam Veterans of America.  (*Id.*)

Urquhart applied for the VSO position and was hired in September 2021.  (Urquhart

Acceptance, ECF No. 30-17.)  He began the following October at an annual salary of $48,887.

(*Id.*)  Krzycki set Urquhart's salary based on his experience, resume, and interview.  (Krzycki

Dep. 60.)  Krzycki also noted that Urquhart already had a necessary credential.  (*Id.*)

The VSO job posting describes the position as one who "counsels, advises, and assists veterans and their dependents in obtaining benefits provided for them by County, State, and Federal Law.  (VSO Job Posting, ECF No. 30-12.)   The VSO's principal duties include: "[c]onduct[ing] interviews of Veterans and/or their dependents . . . , [p]rovid[ing] referrals to other agencies to help meet the needs of the clients . . . , [p]rovid[ing] assistance and/or fil[ing] claims for Veteran's benefits . . ." and "[d]evelop[ing] and maintain[ing] professionals relationships with local agencies . . . ."  (VSO Job Posting, ECF No. 30-12.)

Urquhart's day-to-day responsibilities are consistent with the job posting as he primarily interfaces with veterans who are seeking assistance with various programs and benefits.  (Krzycki Dep. 111.)  He travels roughly fifteen percent of the time but is otherwise in-person at the Office. (*Id.* at 106-07.)

### III. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.* The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

Summary judgment on affirmative defenses may be appropriate.  *Speedeon Data, LLC v. Integrated Direct Mktg., LLC*, 718 F. App'x 333, 337 (6th Cir. 2017).  "For an affirmative defense, the defendant has the burden to show that it is entitled to the defense."  *Id.*

## IV. EQUAL PAY ACT ANALYSIS

The EPA prohibits employers from discriminating on the basis of sex by paying members of one sex lower wages than members of the opposite sex for substantially equal work.  *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 507 (6th Cir. 2021) (citing 29 U.S.C. § 206(d)(1)).  Courts apply a three-step analysis to EPA claims:

> *First*, in order to establish a prima facie case of wage discrimination under the EPA, plaintiffs must show than an employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . . . [P]roof of discriminatory intent is not required[.]
>
> *Second*, once the plaintiff establishes a prima facie case, the defendant must 'prove' that the wage differential is justified under one of the four affirmative defenses set forth under § 206(d)(1) of the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex.  Importantly, a defendant bears both the burden of persuasion and production on its affirmative defenses.
>
> *Finally*, if an EPA defendant proves an affirmative defense, an EPA plaintiff must come forward with evidence demonstrating the existence of a triable issue of fact regarding pretext.

*Schleicher v. Preferred Sols., Inc.*, 831 F.3d 746, 752-53 (6th Cir. 2016) (cleaned up, citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974); *Beck-Wilson v. Principi*, 441 F.3d 353, 359-60, 364-65 (6th Cir. 2006); *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998); *Timmer v. Mich. Dep't of Com.*, 104 F.3d 833, 844 (6th Cir. 1997)).

At bottom, if a plaintiff can establish her prima facie case, "the defendant who makes a motion for summary judgment must demonstrate that there is no genuine issue as to whether the

difference in pay is due to a factor other than sex." *Id.* at 753 (internal quotation marks and alterations omitted).

### A. Krause's Prima Facie Case

To establish her prima facie case, Krause needs to identify a comparator position held by a man at higher pay.  Two jobs "need not be identical in order to be considered 'equal work' under the EPA." *Beck-Wilson*, 441 F.3d at 359.  Rather, the two jobs must be "substantially equal" when considering the requisite skill, effort, responsibility, and working conditions.  *Id.*  Whether a job is substantially equal is "determined on a case-by-case basis and 'resolved by an overall comparison of the work, not its individual segments.'" *Id.* at 359-60 (quoting *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981) (concluding that orderlies and nurse aides performed substantially similar work)).  Whether two positions are substantially equal for EPA purposes is a question of fact for the jury.  *Id.* at 363.

Krause identifies both the VSD and VSO positions as "substantially equal" to her VSC position.  Krzycki obtained the VSD position at an annual salary of $69,732.  Urquhart obtained the VSO position at an annual salary of $48,887.  Krause's final annual salary was $39,663.  So long as a jury could conclude that one or both identified positions is substantially equal to the VSC position, Krause can establish her prima facie case for summary judgment purposes.  The Court concludes she can.

### 1. VSO—Urquhart

The VSO job posting makes clear that Urquhart is primarily responsible for interfacing with veterans seeking benefit assistance.  (VSO Job Posting.)  This matches Krause's primary responsibility as VSC.  (Krause Interrog. ¶ 3.)  A comparison of the VSC (Krause's position) and VSO (Urquhart's position) job postings reveal that while the VSO posting is perhaps more detailed, the functions are the same.  Even the potentially more ancillary, less frequent job duties

match well—for instance, the VSC must "[c]collaborate and coordinate with appropriate Federal, State and local Officials along with community partners" while the VSO "[d]evelops and maintains professional relationships with local agencies servicing veterans." (*Compare* VSC Job Posting *with* VSO Job Posting.)

Of course, "[i]n determining whether a comparator is appropriate for the purposes of an EPA claim, our focus is on actual job requirements and duties, rather than job classifications or titles." *Beck-Wilson*, 441 F.3d at 362. But Krzycki's deposition testimony regarding Urquhart's responsibilities substantiates the similarity. Urquhart's actual responsibilities appear to match the job description. (Krzycki Dep. at 111.) Further, the County agrees in its motion that Krause "listed a number of responsibilities for her former position that matched with some of those associated with the Officer position of Mr. Urquhart." (Def.'s Br. in Supp. of Mot. for Summ. J. 15, ECF No. 30.)

Still, the County argues that while there is indeed overlap, the two positions are "hardly a perfect match." (*Id.*) But a "perfect match" is not the standard. Krause need only show substantial equality. The County hones in on Urquhart's in-home visits with veterans—which Krause was not allowed to do—as an additional job duty that severs the substantial equality between the positions. The Court is unconvinced.

First, it is not clear how often Urquhart performs these in-home visits. Urquhart spends roughly fifteen percent of his time out of the office (Krzycki Dep. 107), but the Court is left to guess as to what that fifteen percent entails. It is possible that all his time outside of the office is performing in-home visits, but it is also possible that his other job responsibilities—such as coordinating with other agencies or performing community outreach—might also take him outside

of the office.  Krause was only prevented from home visits, she was not prevented from performing other duties that took her outside the office.

Second, even if Urquhart spent a full fifteen percent of his time on veteran visits, it is not clear that fifteen percent is substantial to the point of making any comparison with Krause moot or unequal.  Nor is it clear that performing in-home visits should be considered a wholly separate job duty.  These visits appear to be merely another vector of service delivery.  The job duty is the same—interface with veterans to provide benefit assistance—it is simply performed in a different location.

Third, Krause has adduced evidence suggesting that the *reason* she could not perform home visits was itself gendered.  Faul testified that the prohibition "was for her" because "she was a single female going out[.]"  (Faul Dep. 50.)  The County argues that this prohibition had more to do with Krause being a sole employee rather than a female, but Krzycki testified that he always *chooses* to take someone else and that he usually notifies the police as a precaution.  (Krzycki Dep. 73-74.)  He also testified that Urquhart sometimes performs visits by himself "if we know the guy."  (*Id.*)  In other words, Urquhart has leeway to perform in-home visits by modulating safety precautions.  Krause was not given this leeway, and a jury could conclude that the reason was based on sex.  An employer cannot avoid the EPA by gendering job duties.  *See* C.F.R. § 1620.13(b) ("Wage classification systems which designate certain jobs as 'male jobs' and other jobs as 'female jobs' frequently specify markedly lower rates for the 'female[] jobs.'  Such practices indicate a pay practice of discrimination based on sex [under the EPA].")

The comparison between Krause and Urquhart's job duties may not be perfect, but perfection is not necessary.  Krause has adduced sufficient evidence from which a jury could conclude that she and Urquhart performed substantially equal work.

### 2. VSD—Krzycki

Krause and Krzycki's duties overlap, though the comparisons are not as direct as Krause and Urquhart. Krause and Krzycki both had primary responsibility for getting the Office up and running. Krause established the Office (Krause Dep. 14) and Krzycki revamped the Office following the increase in funding (Krzycki Dep. 57). Krause, like Krzycki, interfaced with veterans, partner agencies, and community advocates. (Krause Interrog. ¶ 3; Krzycki Dep. 71-75.) And Krause advocated for the Office by pushing for the millage and implementing grant funding (Krause Dep. 44; Faul Dep. 94), similar in kind to Krzycki's focus on evaluating the Office's scope (Krzycki Dep. 113).

To be sure, the VSD is a not a perfect comparator. The County points to several aspects of Krzcyki's job that Krause did not perform. Krzycki writes grant applications, Krause did not. He spends about eight working days per year on this. (*Id.* at 69.) Krzycki also oversees two individuals—Urquhart and another recent hire. (*Id.* at 115.) Krause only oversaw one individual for a short time (Krause Dep. 66-67).

Indeed, the Office appears to be a more complex operation now than it was during Krause's tenure. The scope of the operation is relevant—"substantially equal" takes working conditions and level of responsibility into account. That puts significant pressure on Krause's ability to establish the VSD as a comparator position. However, the Office was presumably not as complex when it hired Krzycki as it is today. Krause left in March of 2021, after the County had received additional funding but before that funding was implemented. Krzycki began a few months later in August. It is reasonable to infer that the levels of service offered at the time of Krause's resignation and Krzycki's start date were similar. Krzycki began his job with the responsibility *and ability* to expand the scope of the Office. Krause began her job with the responsibility to establish the Office and advocate for its stature in the community and in the County. It is

14

reasonable to conclude that the funding Krzycki enjoys today is in large part due to the efforts of Krause.  This evinces a similar level of skill and responsibility towards advancing the mission of the Office.

Ultimately, the Court acknowledges that this is a close call.  But it finds it significant that at least one key player, Overton, viewed Krause as performing the same day-to-day duties as the VSD at the time Krzycki was hired at higher pay.  To reiterate, Overton advocated for giving Krause the position because "she ha[d] been working under [it] for the last two years" and called the position's "function identical to what she has been performing."  (Overton Email.)  This is strong evidence that *at the time* Krzycki was hired, Krause was performing the same or substantially equal duties.  The Court thus concludes that Krause has adduced sufficient evidence from which a jury could find her job substantially similar to Krzycki's.

### 3. Prima Facie Conclusion

The County argues that Krause's identification of two comparator positions unfairly creates a "moving target[.]" (Def.'s Reply 1, ECF No. 35.)  The Court is unconvinced.  The Sixth Circuit has made clear that "'The text of the EPA may not be brushed with such a demanding gloss' as to suggest that [a] plaintiff['s] prima facie case fails because [she] has not identified 'one specific individual who constitutes a *perfect* male comparator.'"  *Beck-Wilson*, 441 F.3d at 363 (quoting *Wheatley v. Wicomico Cnty.*, 390 F.3d 328, 334 (4th Cir. 2004)).

Here, Krause identifies *two* comparators *both* of whom were paid more than her.  Whether two jobs are substantially equal is a question for the jury, and Krause has adduced sufficient evidence to create a material question of fact on this matter.  The problem for the County is that Krause arguably performed more than Urquhart but less than Krzycki—*how much* more or less is a disputed question of fact that this Court cannot resolve on the record before it.  But what remains

undisputed is that while she may have performed at a level somewhere between these two men, she was paid less than both.

The County argues that Krause would "have to show that she performed the work of two full time employees with substantially different job descriptions" to succeed on her claim.  (Def.'s Br. in Supp. of Mot. for Summ. J. 12.)  The County's logic is backwards.  Without evidence showing that the Office's operations increased significantly from when Krause left in April 2021 to when Krzycki and Urquhart took over six months later, the justifiable inference is that Krause performed at a salary of $39,663 roughly the same work that her successors performed at a combined salary of $118,619.  In other words, she performed twice the work at a third of the pay. This is sufficient to establish a prima facie case at the summary judgment stage.

### B. County's Affirmative Defense

With Krause's prima facie case established, the burden shifts to the County to assert its affirmative defense.  It must show that the wage disparity was based on some factor other than sex. "[T]he burden of proving that a factor other than sex is the basis for a wage differential is a heavy one." *Timmer*, 104 F.3d at 843.  It is both a burden of production and persuasion. *Schleicher*, 831 F.3d at 752-53.  On the County's summary judgment motion, it "must demonstrate that there is no genuine issue as to whether the difference in pay is due to a factor other than sex." *Beck-Wilson*, 441 F.3d at 365.  The County fails to carry this heavy burden.

The County sets forth several factors; none is persuasive.  First, it points to the greater scope and breadth of Krzycki's duties.  But this is properly analyzed in the prima facie analysis, which the Court has concluded Krause has established.  Krause has adduced sufficient evidence to put this job duty comparison in question, and the County has not met that question with sufficient evidence of its own to carry its burden of persuasion.

Second, the County argues that the Office's present wider scope of work justifies the disparity.  But the County has not provided significant evidence as to the expanded scope.  It is unclear what level of service is provided today versus what level of service was provided when Krause resigned.  Even more to the point, there is no evidence as to the comparative level of service in the first few months of Krzycki and Urquhart's employment.  Without such evidence, the County has not proved "so clearly that no rational jury" could find the pay disparity had anything to do with sex. *Briggs*, 11 F.4th at 508.

Third, the County points to the background, experience, and expertise of Urquhart and the need to entice him with a higher salary.  The County is on weak ground here.  First, the evidence belies its position.  Krause and Urquhart had similar experience prior to working at the Office. Both worked for more than thirty-five years in a variety of roles.  It is not clear that any one job was more relevant to the work at the Office than any other job.  Second, "no authority supports the concept that an employee's prior salary or demand for a specific salary is sufficient in isolation to justify a wage differential." *Id.* at 510.  It is no defense to a charge of wage discrimination to say that the man—who is performing substantially similar work—required a higher salary to be "lured" to the job.  "Such a rule would simply perpetuate existing sex-based pay disparities and undercut the purpose of the Act—to require that those doing the same work receive the same pay." *Id.*

Fourth and finally, the County looks to the increased funding from the millage to justify its wage disparity.  This dovetails with the County's argument about the scope of the Office, but it also presents a separate potential factor-other-than-sex focused solely on the level of funding.  In other words, the County may be presenting a defense that it only paid Krause less because her salary was all that it could afford.  Although the County does not present authority for such a

factor, at least one other court has examined budgetary concerns and found them to be a "bona fide" factor justifying a pay disparity. *Lauderdale v. Ill. Dep't of Hum. Servs.*, 210 F. Supp. 3d 1012, 1018-20 (C.D. Ill. 2016).

Still, the County does not carry its burden of persuasion or production on this issue. First, it is unclear how much funding was available for Krause's salary prior to the millage. Was she being paid the maximum amount authorized by the County budget? The Court is left to guess. Second, the millage was passed while Krause worked for the Office. (Faul Dep. 55.) When exactly the funding became available is not clear, but what is clear is that Krause was recommended for the VSD position at a salary of $55,000 at least six months prior to her resignation. (Overton Email.) Thus, the County has failed to prove that the wage disparity persisted only due to budgetary constraints.

### C. Pretext

Because the County has failed to prove its affirmative defense, Krause need not produce evidence of pretext. *Beck-Wilson*, 441 F.3d at 365. As such, the Court need not address this portion of the analysis. Note, though, that pretext is relevant to Krause's state law claims discussed later in this Opinion.

### D. EPA Conclusion

The Court concludes that the County has failed to carry its summary judgment burden. Krause can at least establish a material question of fact as to her prima facie case—she was paid less than two men for work that a jury could reasonably conclude was substantially equal. The County has not adduced sufficient evidence to conclusively establish that this pay disparity was justified by a factor other than sex. A jury could reasonably decide one way or the other. The Court will deny the County's motion for summary judgment on Krause's EPA claim.

## V. ELCRA ANALYSIS

Krause's wage disparity claim under Michigan's ELCRA is similar to her claim under the EPA, but the burden-shifting works differently. "ELCRA claims generally are to be evaluated on summary disposition in the same manner as Title VII claims[.]" *Conti v. Am. Axle & Mfg., Inc.*, 326 F. App'x 900, 908 (6th Cir. 2009) (citing *Harrison v. Olde Fin. Corp.*, 572 N.W.2d 679, 681 (Mich. Ct. App. 1997)).  Under Title VII, after the plaintiff establishes a prima facie case of wage discrimination, the employer must proffer "a legitimate non-discriminatory reason" which "may include one of the affirmative defenses set forth in the EPA." *Briggs*, 11 F.4th at 508-09.  But this is merely a burden of production.  If this burden is met, the plaintiff then has the burden of production and persuasion to show "that the employer's proffered reasons were a mere pretext for discrimination." *Id.*  Here, Krause has sufficiently established her prima facie case and the County has offered non-discriminatory justifications.  Krause now has the burden to show pretext.

Krause primarily presents sexist comments and attitudes by various County representatives as evidence of pretext.  In the Title VII context, sexist comments may sometimes be used to establish pretext for a sex discrimination claim. *See Price Waterhouse v. Hopkin*, 490 U.S. 228, 251 (1989) ("The plaintiff must show that the employer actually relied on her gender in making its decision.  In making this showing, stereotyped remarks can certainly be *evidence* that gender played a part."); *but see Driggers v. City of Owensboro*, 110 F. App'x 499, 510 (6th Cir. 2004) ("Unlike the facts in *Price Waterhouse*, where the decision-makers made overtly sexist comments during the selection process, none of the officers involved [here] made sexist comments in the context of the investigation.")  For ELCRA discrimination claims, Michigan courts analyze whether sexist comments are merely "stray remarks" rather than evidence of sex discrimination by considering:

(1) whether the alleged discriminatory remarks were made by the person who made the adverse employment decision or by an agent of the employer that was uninvolved in the challenged decision, (2) whether the alleged discriminatory remarks were isolated or part of a pattern of biased comments, (3) whether the alleged discriminatory remarks were made in close temporal proximity to the challenged employment decision, and (4) whether the alleged discriminatory remarks were ambiguous or clearly reflective of discriminatory bias.

*Major v. Vill. of Newberry*, 892 N.W.2d 402, 414 (Mich. Ct. App. 2016) (quoting *Dep't of Civil Rights ex rel. Burnside v. Fashion Bug of Det.*, 702 N.W.2d 154, 157 (Mich. 2005) (Taylor, J., concurring)).  Although the parties do not analyze the pretext question in detail, the Court views Michigan courts' approach in an analogous context helpful.

Krause proffers two gendered comments from Commissioner Peat.  In a meeting with Overton, Faul, Peat, and the other commissioners, Krause asked for a raise.  (Krause Dep. 74.) Krause testified that "Peat said that if I was a good little girl, he would make sure I got a raise." (*Id.*)  Additionally, Peat testified that he viewed Krzycki as a hero for his military service, but "never really thought of [Krause] like that[.]" (Peat Dep. 35.)  Krause and Krzycki both spent more than twenty years in the service.

Applying Michigan's analysis to Peat's comments, the Court concludes these comments were more than mere stray remarks.  Peat had some share of hiring authority over the VSD position and could influence Krause's pay.  While his remark about Krause earning a raise if she was "a good little girl" might be ambiguous in isolation, Peat's testimony about how he viewed Krause's military service compared to Krzycki is instructive.  Combined, these comments evince at least a justifiable inference of sex-based discriminatory attitude.  These comments were made at the time Krause asked for a raise and reflect Peat's attitude towards Krause and Krzycki at the time he was hiring for the VSD position.  These were thus not stray remarks and as such are evidence that gender played a part in the County's wage decisions.  *Price Waterhouse,* 90 U.S. at 251.

Additionally, the County's restriction on Krause performing in-home visits is similarly concerning.  Although the County has presented some evidence that this was a gender-neutral policy, there is also evidence that it was not.  Faul specifically referenced Krause's gender as necessitating additional protection and Krzycki testified that solo visits may be done with certain precautions in mind.  Considered together, it is reasonable to conclude that the County restricted Krause's job responsibilities based on sex.

Weighing the evidence in favor of Krause, Peat's comments combined with the County's apparently gendered-based job restrictions suggest a discriminatory attitude towards what women should and should not do in the workplace.  When Krause resigned, the County viewed it as an "opportunity . . . to get a higher level skillset." (4/1/2021 Email.)  But Krause was viewed by both Overton and Faul as having the requisite skillset to do the job it ultimately gave to Krzycki. (Overton Email; 10/13/2020 Faul Email.)  Considering these factors, the Court concludes that Krause has presented sufficient evidence to create a genuine question of a material question. Whether the County's proffered reasons actually motivated the pay differential is a question of fact for the jury to decide.

The Court will deny the County's summary judgment motion on Krause's ELCRA claim.

### VI. WORKFORCE OPPORTUNITY AND WAGE ACT ANALYSIS

A claim under Michigan's WOWA may only be brought against an entity not subject to the requirements of the Fair Labor Standards Act ("FLSA").  Mich. Comp. Laws 408.420(1).  The County is a political subdivision of a state and is therefore subject to the requirements of FLSA. 29 U.S.C. § 203(d), (e)(2)(c).  Krause does not appear to contest this argument.  The Court will grant the County's motion for summary judgment on the WOWA claim.

## VII. CONCLUSION

Krause's EPA and ELCRA claims remain while her WOWA claim will be dismissed.  An order will enter consistent with this Opinion.

Dated: June 17, 2024                    /s/ Hala Y. Jarbou
                                        HALA Y. JARBOU
                                        CHIEF UNITED STATES DISTRICT JUDGE